FILED

2006 Jul-11  PM 01:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **FERN FRANKS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  3:02-CV-2364-RDP** |
| | } | |
| **ANTHONY R. CLAYTON, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before the court is Defendants' Motion to Exclude Expert Witness Testimony of Cloyd Robinson, Jr., Edward Barbieri and Sharon Silvers (Doc. #199) (the "*Daubert* motion") filed on May 12, 2006.[1]  Plaintiff filed her opposition (Doc. #207) and supportive evidence (Doc. #208) on May 26, 2006.  The court held a *Daubert* hearing in this case on Wednesday, June 21, 2006**,** beginning at 9:30 a.m. in courtroom 7A.

As stipulated by the parties on the record during the hearing, Plaintiff concedes that she no longer opposes that portion of Defendants' *Daubert* motion that pertains to Silvers' qualifications to address the  potential additive effects of hydrocodone and methamphetamine, and Plaintiff agrees that she will not call Silvers to testify on this particular subject area at trial.  Accordingly, the only remaining issues for the court to address are the admissibility of: 1) Plaintiff's expert testimony pertaining to the qualitative and quantitative levels of hydrocodone found in Defendant Anthony

---

[1]Defendants actually filed four identical motions that sought to exclude Plaintiff's expert testimony regarding hydrocodone and methamphetamine.  (Doc. #199; Doc. #200; Doc. #201; Doc. #202).  On June 14, 2006, for ease of reference, the court terminated the pending status of the other three duplicate motions and left only Doc. #199 pending.

Clayton's blood sample; and 2) Plaintiff's expert testimony relating to the qualitative and quantitative levels of methamphetamine found in Clayton's blood sample.  As discussed in detail below, Defendants' *Daubert* motion is due to be denied as it relates to these areas of expert evidence.

## II.    BACKGROUND

This litigation arises from a deadly vehicular accident that occurred on a two-lane road  in Hardin County, Tennessee on August 21, 2002 at approximately 11:25 a.m.  Decedent Joel Boyd Franks was operating a dump truck which collided with a log truck allegedly driven negligently and/or wantonly by Clayton.  Pursuant to the Pretrial Order entered on April 16, 2006, Plaintiff will contend that samples of Clayton's blood contained "significant" levels of hydrocodone and methamphetamine and will offer testimony to reveal the effect the controlled substances had on Clayton at the time of this accident.

Following the accident, a blood sample identified as taken from Clayton at around 3:45 p.m. on the day of the accident was subsequently tested and analyzed on or around September 13, 2002 by Sharon Silvers of the Tennessee Bureau of Investigations.  Silvers has testified that she performed a screening test and a "confirmation test" to identify the components that were in the blood sample. She testified that she detected methamphetamine, Tramadol and Hydrocodone but was not able to quantify the amount of those drugs as the levels were below the levels of quantification for her instrumentation.

Thereafter, a sample of Clayton's blood was sent for further analysis to National Medical Services in Philadelphia, Pennsylvania, where Dr. Edward Barbieri is a forensic toxicologist. Pursuant to a January 6, 2003 report, the Pennsylvania facility performed an analysis on the sample and quantified the hydrocodone at a level of 92 nanograms per ml.  (Doc. #199 at Ex. 2 at 34).

Barbieri is expected to testify that subsequently, in October 2005, his facility received another sample from the Tennessee Bureau of Investigation following a request from Plaintiff's counsel. Testing of the second sample identified and quantified methamphetamine at a level of 41 nanograms per ml.[2]  (Doc. #199 at Ex. 2 at 64).

Finally, Dr. Cloyd Robinson, a pharmacologist, reviewed documents regarding the testing of the blood samples and gave testimony at his deposition regarding the opinions he reached. Plaintiff is expected to call Robinson to testify that, in his opinion, Clayton would have consumed hydrocodone "on the day of the accident."  (Doc. # 199 at Ex. 3 at 46).

## IV.    ANALYSIS

### A.    Federal Rule of Evidence 702

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and reaffirms the trial court's role as "gatekeeper:"

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Civ. P. 702.  Rule 702 must be read in conjunction with three seminal decisions by the Supreme Court related to expert testimony.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

---

[2] The delay in obtaining a quantitative amount of methamphetamine was a result of the first laboratory's inability to test Clayton's blood sample in that manner.  As Plaintiff's experts testified, the lapse in time between the two testing events could not have elevated the concentration level of methamphetamine, but in fact would have had a slightly degrading impact on the concentration. (Doc. #199 at Ex. 2 at 65-70; Doc. #199 at Ex. 3 at 57-58, 117).

579 (1993); *General Electric Co. v. Joiner*, 522 U.S. 136 (1997); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

In *Daubert*, the Supreme Court rejected the previously followed "general acceptance" standard on the admissibility of scientific expert testimony established in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Instead, the *Daubert* Court addressed admissibility of scientific expert testimony within the framework of Federal Rule of Evidence 702 and emphasized the role of the district court in performing a "gatekeeping" function to ensure that any admitted expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 592-94.

In describing the district court's gatekeeping function, the Court stated:

> [T]he trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert*, 509 U.S. at 592-93.

Thereafter, in *Joiner*, the Supreme Court upheld a district court's decision granting summary judgment for the defendant on the basis that the plaintiff's experts' testimony connecting plaintiff's cancer to his exposure to PCBs and other chemicals did not rise above the level of subjective belief and speculation. *Joiner*, 522 U.S. at 138-39. In clarifying the standard articulated by *Daubert* that requires such testimony to be sufficiently relevant and reliable, the *Joiner* Court pointed out that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146 (citation omitted).

4

Two years later, the court issued the *Kumho Tire* decision, which extended the *Daubert* analysis to all types of "technical and other specialized knowledge." *Kumho Tire*, 526 U.S. at 141. ("We conclude that *Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."). In *Kumho Tire*, the Court addressed the admissibility of proffered testimony from an engineer who was an expert in tire failure analysis. *Kumho Tire*, 526 U.S. at 141. In upholding the district court's decision to exclude the plaintiff's expert's testimony based upon lack of reliability, the Supreme Court noted that the relevant inquiry was whether the expert could reliably determine the cause of the specific tire's separation. *Kumho Tire*, 526 U.S. at 154.

Based upon the guidance provided by the Supreme Court in the aforementioned decisions, Plaintiff must prove the following items by a preponderance of the evidence in order for this court to admit her expert opinions: (1) her expert is qualified to testify regarding the matters she intends to address; (2) the methodology by which the expert reaches her conclusions is sufficiently reliable; and (3) the expert's opinions are "sufficiently tied to the facts of the case [so] that it will aid the jury in resolving a factual dispute" (*i.e.*, that the opinion and the facts of the case "fit"). *Daubert*, 509 U.S. at 591; *see also Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001). Whether these requirements are met is within the sound discretion of this court, tempered with a "liberal policy of admissibility." *Joiner*, 522 U.S. at 138-139; *Daubert*, 509 U.S. at 596. While there is necessarily some overlap when these requirements are applied, they are distinct concepts, and their application requires independent analyses. *Quiet Tech. v. Hurel-Dubois UK*, 326 F.3d 1333, 1341 (11th Cir. 2003).

In this case, Defendants argue that the opinions of Plaintiff's experts cannot withstand scrutiny under either the court's gate-keeping function regarding admission of relevant evidence[3] or the third *Daubert* requirement of fitness. (Doc.#99 at 2).[4]   The court disagrees for the reasons outlined below and finds that, with the exception of the portion of Silvers' testimony about which the parties have reached an agreement, Plaintiff's expert testimony is not due to be excluded.

### B.   Specific Application of Rules 403 and 702 to the Proffered Expert Testimony in this Case

#### 1.   Relevancy and Rule 403

As noted earlier, Defendants' primary theory for exclusion of Plaintiff's expert testimony is centered on Rule 403 (rather than Rule 702) of the Federal Rules of Evidence.  Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

---

[3]As discussed during the hearing, Defendants primarily base their exclusion of Plaintiff's expert testimony on Rule 403 of the Federal Rules of Evidence.  While this evidentiary issue could have also been raised by way of a motion in limine, the court understands and accepts Defendants' reasons for including it as part of its *Daubert* motion.

[4]Defendants never challenged the qualifications of Dr. Robinson or Dr. Barbieri in either their *Daubert* motion or during the hearing.  While portions of Defendants' *Daubert* motion seem to challenge whether Plaintiff's experts have met the second  requirement, Defendants confirmed in open court that they do not challenge the methodology used by Plaintiff's experts to determine the qualitative and quantitative drug levels contained in Clayton's blood.  Moreover, Defendants' "chain of custody" attack on the methodology of Plaintiff's experts misses the mark in the Eleventh Circuit: "It is firmly established in this Circuit that the question whether the proponent of evidence has proved an adequate chain of custody goes to the weight rather than the admissibility of the evidence, and is thus reserved for the jury." *Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1154 (5th Cir.1981) (citing *United States v. Henderson*, 588 F.2d 157, 160 (5th Cir.1979)) (other citations omitted). Furthermore, and in any event, the court is satisfied that, pursuant to Rules 901 and/or 902 of the Federal Rules of Evidence, Plaintiff has properly authenticated the records surrounding Clayton's blood sample that are relied upon by Plaintiff's experts.  *See U.S. v. Dickerson*, 248 F.3d 1036 (11th Cir. 2001) (describing methods under which business records may be properly authenticated) (citing *Itel Capital Corp. v. Cups Coal Co.*, 707 F.2d 1253, 1259 (11th Cir. 1983)).  This same method of authentication applies to governmental records.

the jury, or by considerations of undue delay, waste of time, or needless presentation
of cumulative evidence.

Fed. R. Evid. 403.  According to Defendants, to the extent Plaintiff's expert testimony is relevant
and admissible under Rule 702, its limited probative value is substantially outweighed by the danger
of unfair prejudice.  Accordingly, Plaintiff urges this court to exclude all of the expert evidence
entirely.

Although Defendants focus on what they perceive to be the limited probative value of the
testimony at issue, the court finds it significant that is not a situation in which Plaintiff's experts have
relied on the toxicology reports "standing alone" to show possible impairment.  *Evans v. Toyota
Motor Corp.*, No. Civ. A. V-03-09, 2005 WL 3844071, at *1 (S.D. Tex. Sept. 2, 2005) ("Any
evidence of drug use (prescription, illicit, or otherwise) is only relevant in this case if it tends to
establish that Lisa Evans' cognitive skills and/or psychomotor skills were impaired at the time of her
death.").   In such a case where the data "stands alone," the probative value of the expert opinion is
significantly decreased because the question of whether the defendant was under the influence of
drugs and therefore improperly operating a motor vehicle is not answered by the expert and instead
left for the fact finder to infer.   To the contrary in this case, Plaintiff's experts have deduced from
the toxicology findings that Clayton's cognitive skills and/or psychomotor skills were impaired at
the time of the accident because he was likely under the influence of hydrocodone and
methamphetamine,[5] thus providing a reasonable explanation to support Plaintiff's contention that

_____

[5]For example, Dr. Robinson testified  that it was more probable than not that Clayton took
hydrocodone on the day of the accident (as opposed to the night before as averred by Clayton) and
that Clayton took twice the usual dose.  (Doc. #199 at Ex. 3 at 8-11).  In particular, Robinson relied
on Clayton's weight and other factors and opined that to only have taken hydrocodone the night
before the accident, Clayton would have had to consume around ten tablets, resulting in "a
potentially lethal blood concentration of hydrocodone."  (Doc. #199 at Ex. 3 at 46-49).  Similarly,

Clayton's vehicle crossed into the Decedent's lane.[6]  Furthermore, the probative value of the expert

opinions in this case is bolstered by Tennessee law, which appears to provide a basis for finding

Clayton *per se* intoxicated due to the levels of hydrocodone and methamphetamine detected in his

blood.[7]

Thus, the court finds that the probative value of the expert testimony in this case is *not*

minimal and therefore not substantially outweighed by the danger of unfair prejudice.   Having so

---

Barbieri testified that Clayton had a substantial or "therapeutic" amount of methamphetamine in his blood at the time of the accident.  (Doc. #199 at Ex. 2 at 36-39, 53-55, 64).

[6]The court appreciates Defendants' point that Plaintiff's experts are unable to pinpoint the exact timing of when Clayton actually took the hydrocodone and/or methamphetamine (*i.e.*, before or after the accident).  However, this open issue does not render the expert testimony irrelevant or of limited probative rate.  Instead, this factual dispute regarding timing (and credibility) is for the jury to resolve.

[7]Tennessee Code § 55-10-401 provides in part:

(a)      It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or any other premises which is generally frequented by the public at large, while:

(1)      Under the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system; or

(2)      The alcohol concentration in such person's blood or breath is eight- hundredths of one percent (.08%) or more.

T. C. A. § 55-10-401.  Therefore, unlike blood alcohol concentration levels, **any** concentration level of an "intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system" is unlawful under Tennessee law. *See McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992) (finding that the criminal presumption of intoxication established by T.C.A. § 55-10-408(b)(1988) is admissible evidence in a civil case); *Brown v. J.C. Penney Life Ins. Co.*, 861 S.W.2d 834, 836 (Tenn. App. 1992) (noting that the rules for impairment created by Tenn. Code §§ 55-10-401, *et seq.* also control in civil cases).

found, the court now turns to Defendants' alternative contention that the expert testimony lacks "fitness" under the third *Daubert* prong.[8]

### 2. Fitness of Plaintiff's Expert Testimony

In challenging the fitness of the testimony offered by Plaintiff's experts, Defendants assert that the testimony lacks any concrete application because none of the experts have expressly testified that Clayton was impaired by hydrocodone, methamphetamine, and/or by the combined effect of the two drugs such that his impairment definitively caused or contributed to the accident. Instead, the experts offer only an indirect opinion that the test results of Clayton's blood sample indicate that he was impaired and that an average driver with such an impaired status would be affected in several ways, including suppression of the central nervous system (hydrocodone), slow down in reaction time (hydrocodone), and stimulation of the central nervous system (methamphetamine). (Doc. #199 at Ex. 3 at 81-82 ("These drugs are central nervous system depressants, and as such they are going to have effects on reaction time and judgment and that sort of thing. It is possible he could appear perfectly fine, but his [*i.e.*, Clayton's] reaction times would be impaired."); (Doc. #199 at Ex. 2 at 54 ("[T]he sedation associated with the hydrocodone may be negated to some effect by the central nervous system stimulation of the methamphetamine. Most of the other effects would not cancel each other out or be negated by one or the other since their pharmacologic mechanism of action is quite different and the effects of the compounds are quite different.")).

The court is not persuaded by this argument because its decision to allow the expert testimony is, in fact, largely based on the limited and tailored nature of the expert testimony

---

[8]Although separately considered by this court, the analyses under Rule 403 and *Daubert* fitness share common underpinnings.

proffered by Plaintiff.  Ironically, if the experts had offered more forceful and pointed opinions, which Defendants seem to argue Rule 703 requires, then there may well have been "simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.  Moreover, Plaintiff has adduced testimony from other sources to indicate Clayton's impairment, including a lay witness who testified that she observed Clayton driving at a speed too fast under the circumstances a few minutes prior to the collision,[9] and other evidence noted above that suggests Clayton's vehicle crossed over into Decedent's lane.  These other pieces of evidence relied upon by Plaintiff, in conjunction with the expert testimony, help supply the analytic "fit" necessary to satisfy the third *Daubert* requirement and to enable the trier of fact to resolve the question of whether Clayton was impaired at the time of the accident and whether this impairment caused or contributed to its occurrence.

Finally, the court notes that Defendants' expert challenges are remedied, at least in part, by the principles embraced by the Eleventh Circuit in *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333 (11th Cir. 2003):  "The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination.  Indeed, 'in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.'" *Quiet Tech*, 326 F.3d at 1345 (citations omitted).  As in *Quiet Tech*, while the deficiencies identified by Defendants in their *Daubert* motion may be suitable topics for cross examination, they do not reach the threshold level established by the Supreme Court in *Daubert* to exclude the evidence.

_____

[9] The court recognizes that Defendants have filed a separate motion in limine to exclude the lay witness testimony.  (Doc. # 224).  The court will address that motion by separate order.

## V.      CONCLUSION

Therefore, the court concludes that Plaintiff's expert testimony is both relevant and reliable, and its admission at trial is consistent with the analyses of the Supreme Court in *Daubert*, *Joiner*, and *Kumho Tire*.   Moreover, the court is not persuaded by Defendants' Rule 403 argument that the testimony is minimally probative or that any probativeness is substantially outweighed by the danger of potential prejudice.   The court will enter an order granting Defendants' *Daubert* motion as it relates to any testimony from Silvers as to the addictive effects of hydrocodone and methamphetamine but denying the *Daubert* motions in all other respects.

**DONE** and **ORDERED** this _____11th_____ day of July, 2006.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

11